**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

EVERETT ESTELLE,

               Plaintiff,

-vs-                                     Case No.   2:11-cv-337-FtM-99SPC

MICHAEL J. ASTRUE, Commissioner of Social
Security,

               Defendant.

_____

**REPORT AND RECOMMENDATION**[1]

**TO THE UNITED STATES DISTRICT COURT**

      This matter comes before the Court on the Plaintiff, Everett Estelle's Complaint seeking review of the final decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's claim for disability insurance (Doc. # 1) filed on June 9, 2011.   The Plaintiff filed his Memorandum in Opposition to the Commissioner's Decision (Doc. # 22) on December 30, 2011. The Commissioner filed a Memorandum in Support of the Commissioner's Decision (Doc. # 24) on February 24, 2012.   Thus, the Motion is now ripe for review.

      The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

---

[1] This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 42 U.S.C. § 405 (g).

## **FACTS**

### *Procedural History*

The Plaintiff filed a Title II application on July 21, 2008, for Supplemental Security Income (Tr. 87-90), which the Social Security Administration (SSA) denied initially on August 8, 2008, and upon reconsideration on December 19, 2008. (Tr. 52-58).   On February 12, 2009, Plaintiff filed a written request for hearing. (Tr. 61).   On September 21, 2009, the ALJ held a hearing, and on October 7, 2009, the ALJ found that Plaintiff was not disabled. (Tr. 39-50).   On April 22, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. 2).   Plaintiff challenges the ALJ's finding that he could perform light work and was therefore not disabled, and appeals the decision denying benefits under 42 U.S.C. § 1383(c)(3).

### *Plaintiff's History*

On the date he filed his application, Plaintiff was 43 years old. (Tr. 25).   Plaintiff has a limited education. (Tr. 48, 103).   He alleges an onset of disability from February 16, 2008. (Tr. 85). Plaintiff alleges disability due to severe back injury, disk problems, and fused bones. (Tr. 99).

### *Medical and Psychological History*

The medical evidence shows that Plaintiff had back surgery in 1992 from a work related injury. (Tr. 240).   Plaintiff stated that he had numbness before and after his 1992 surgery. (Tr. 240).   On July 21, 2008, Plaintiff was admitted to Peace River Regional Medical Center emergency room complaining of back pain and sciatica that had bothered him for four days. (Tr. 207-210, 219-225).   Plaintiff was subsequently prescribed Valium, Vicodin, and Naprosyn, and discharged with a recommendation to follow up with his doctor. (Tr. 225).

On July 29, 2008, Plaintiff once again presented himself to the ER. (Tr. 212-217).   He

complained that he suffered a fall from a standing position, which caused a new back injury and back pain. (Tr. 213, 217).   Physical examinations from Peace River Medical Center revealed Plaintiff was in no acute distress, he had painless range of motion in his back and full range of motion in his extremities. (Tr. 214, 221).   Plaintiff was given Percocet to treat his pain and discharged. (Tr. 217).   Radiology records showed "moderate disc space narrowing, vacuum disc phenomenon" and retrolisthesis at L4-L5 level. (Tr. 218).   In addition, there was a marked narrowing of a partially fused L5-S1 disc space and moderately severe degenerative changes at L4-L5 level. (Tr. 218).   Upon discharge, on July 29, 2008, Plaintiff ambulated unassisted and had a steady gait. (Tr. 216).

### Dr. Steven S. Baker, M.D.

Due to these problems, on August 6, 2008, Plaintiff presented to the office of an orthopedic doctor, Steven S. Baker, M.D. (Tr. 239).   Dr. Baker took an X-Ray of Plaintiff's lumbar spine, which revealed a degenerative disc disease "with considerable disc space narrowing and nearly complete collapse at L5-S1." (Tr. 239, 242).   Dr. Baker also noted that Plaintiff suffered from marked pedal edema in both of his legs. (Tr. 239).   Dr. Baker performed a steroid injection on Plaintiff and instructed him to follow up in 2-3 weeks to see if there was any response to the injection as far as pain relief. (Tr. 239).   Plaintiff further indicated to Dr. Baker that he had had a back injury in 1992, which resulted in a disc excision and fusion procedure being performed on Plaintiff at that time in New Jersey. (Tr. 239).

In addition, during the initial evaluation and subsequent evaluations, Dr. Baker noted that Plaintiff had chest pain and shortness of breath. (Tr. 240, 245). These problems were also remarked by Chris R. Webb, M.D., who indicated that Plaintiff had a markedly positive family

history of coronary disease. (Tr. 252-253, 255, 257, 259-260, 307, 323).   Dr. Webb performed a chest X-Ray that indicated that Plaintiff had chronic paronchymal scarring in his chest. (Tr. 257). The records indicate that Plaintiff was prescribed Diltiazem, (Tr. 382), a chest pain medication.

At the August 20, 2008, follow-up appointment, Plaintiff noted that he feels the injection helped his pedal edema, but he continued suffering from back pain. (Tr. 237).   Upon this information, Dr. Baker decided to send Plaintiff for a magnetic resonance imaging ("MRI") test of the lumbar spine in order to determine whether there is spinal instability or significant neurological involvement, and in order to evaluate the nature of the possible spinal fusion Plaintiff had before. (Tr. 237).   Dr. Baker noted that Plaintiff may need a referral to a neurologist due to the nature of his neurological problems. (Tr. 237).

Plaintiff underwent the MRI of the lumbar spine without contrast on September 8, 2008. (Tr. 241).   On September 10, 2008, Dr. Baker examined the MRI films and indicated that Plaintiff has a "very large herniation" at L5-S1 level which appeared to be causing "significant central stenosis" in his lumbar spine. (Tr. 235).   Dr. Baker indicated the MRI also showed that Plaintiff had a possible fusion at L5 in 1992. (Tr. 235).   Dr. Baker noted in Plaintiff's complaint that if he stands for prolonged period of time, he feels wobbly in his legs. (Tr. 236).   Having obtained these MRI results, Dr. Baker indicated there is nothing he could do for the Plaintiff, and referred Plaintiff to a neurosurgeon, Jose Cabrera, M.D. (Tr. 235, 245-246).

### *Dr. Jose Cabrera, M.D.*

On September 17, 2008, Dr. Cabrera noted that before he would do any kind of surgical procedure, Plaintiff must look for a primary care physician as Plaintiff had medical problems which needed to be addressed first before he would perform any kind of surgery. (Tr. 246).   In

addition, having reviewed the September 8, 2008, MRI of Plaintiff's lumbar spine without contrast, Dr. Cabrera also noted that Plaintiff needs another MRI scan of the lumbar spine with contrast. (Tr. 241, 246).

<u>*Dr. Chris R. Webb, M.D., Primary Physician*</u>

On September, 29, 2008, Plaintiff presented to the office of Chris R. Webb, M.D., in order to obtain a preoperative clearance for the back surgery suggested by Dr. Cabrera. (Tr. 253).   Dr. Webb noted that Plaintiff has problems with hypertension, obesity, chest pain, shortness of breath, and possible panic disorder. (Tr. 253).   Dr. Webb noted that Plaintiff weighed 300 pounds, suffered from chest pain when mentally agitated, and had loss of breath easily. (Tr. 253).   Dr. Webb indicated that Plaintiff would need to undergo an electrocardiogram ("EKG") and Persantine nuclear stress test before obtaining a clearance for back surgery. (Tr. 253).   The EKG performed that day was borderline with T-wave changes in inferior leads. (Tr. 256).

On October 7, 2008, Plaintiff began suffering from chest tightness while resting and was admitted for an evaluation by Dr. Webb the following day at Charlotte Regional Medical Center. (Tr. 257, 259-260, 307, 312-313).   A study was performed on October 8, 2008, by Ricardo R. Martinez, M.D., which revealed a mild concentric left ventricular hypertrophy. (Tr. 255-256, 308, 316).   On October 9, 2008, Dr. Webb noted that Plaintiff's chest pain is probably not cardiac in nature, but he would still need to perform a nuclear stress test. (Tr. 257).   Dr. Webb diagnosed Plaintiff with chest pain, hypertension, obesity, and chronic low back pain. (Tr. 257).

On October 27, 2008, Plaintiff was admitted by Dr. Webb with atypical chest pain. (Tr. 252).   Dr. Webb noted that Plaintiff had, among other problems, inadequately controlled hypertension and anxiety neurosis. (Tr. 252).   Dr. Webb also reported that Plaintiff had "a lot of

anxiety." (Tr. 252).   On March 19, 2009, Plaintiff was again admitted for severe shortness of breath and chest pain. (Tr. 358-361).   Emergency room records from Peace River Medical Center indicated that Plaintiff had a previous admission due to hypertension and shortness of breath on August 12, 2008. (Tr. 371).   Between December, 9, 2008, and March 6, 2009, Plaintiff underwent treatment at Charlotte Heart & Vascular Institute. (Tr. 382-392).   A stress test was performed on December 9, 2008. (Tr. 391).   It showed resistance index of the inferior and apical regions, and Plaintiff's physician recommended heart catherization which was undergone on January 15, 2009. (Tr. 385, 389).   Dr. Baker noted in April 2009, that Plaintiff's most recent CT scan of his lumbar spine was "relatively benign." (Tr. 357, 394).   On March 6, 2009, Plaintiff was instructed to follow up with another stress test in six months. (Tr. 383).

### *Dr. Edward Holifield, M.D.*

In December 2008, Edward Holifield, M.D. reviewed Plaintiff's medical evidence in regards to his physical impairments and opined that Plaintiff could perform a reduced range of light work. (Tr. 299-300).   According to Dr. Holifield, Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally and he could stand and/or walk six hours in an eight hour work day and sit six hours in an eight hour work day. (Tr. 299).

### *Dr. Kenneth Visser, M.D., State Consultative Physician*

On November 20, 2008, Plaintiff was seen by a Social Security Administration mental health professional, Kenneth Visser, M.D., for a consultative examination of Plaintiff's mental problems. (Tr. 261-267).   Dr. Visser noted that Plaintiff was 6 feet tall, weighed 291 pounds, and presented as a very demoralized person who lost his purpose and direction. (Tr. 261).   Dr. Visser observed that Plaintiff's affect fluctuates between despair and agitation. (Tr. 263).   Plaintiff was

very self-critical and viewed himself as a failure which affected his ability to relate to others. (Tr. 264).   Dr. Visser noted that Plaintiff is unable to reach his feet and needs assistance of others with foot hygiene. (Tr. 262).

Dr. Visser's testing revealed markedly low limitations in Plaintiff's ability to concentrate and focus as evidenced by a markedly low score on a serial 7's, 3's, and 20's test. (Tr. 264).   In addition, Plaintiff had poor reading skills, scoring only 66 points on the Reading Section of the Wechsler Individual Achievement Test II. (Tr. 264).   Dr. Visser diagnosed Plaintiff with severe Major Depressive Disorder, reading disorder, and determined that Plaintiff had a global assessment of functioning ("GAF") score of 50.[2]  (Tr. 264-265).   He also opined that Plaintiff had marked or extreme limitations in activities of daily living; marked or extreme limitations in social functioning; and marked or extreme limitations in the areas of concentration, persistence, and pace (Tr. 265).

However, Dr. Visser noted that Plaintiff had never received mental health treatment, although at one point he was taking Xanax. (Tr. 262). Dr. Visser observed that Plaintiff was acceptably dressed and groomed, he presented information in a logical manner, and he did not lose his train of thought or go off on tangents. (Tr. 263).

### *Dr. Gildegardo Alidon, M.D., State Program Psychologist*

On December 17, 2008, Social Security Administration had Plaintiff evaluated by a program psychologist, Gildegardo Alidon, M.D. (Tr. 280-283).   Dr. Alidon stated that Plaintiff was moderately limited in his ability to understand and remember detailed instructions; moderately limited in ability to maintain attention and concentration for extended periods;

---

[2] A GAF between 41 and 50 indicates severe symptoms or any severe impairment in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") 32 (American Psychiatric Ass'n 1994).

moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; and moderately limited in his ability to set realistic goals or make plans independently of others. (Tr. 280-281).

Based on his review of the evidence, Dr. Alidon opined that Plaintiff "continued to function adequately from a mental standpoint" and that his difficulties with activities of daily living and social functioning were mild and his difficulties in maintaining concentration persistence or pace were moderate. (Tr. 294, 296).   Dr. Alidon opined that with such limitations Plaintiff would nonetheless be able to perform simple and repetitive tasks through a normal work day. (Tr. 282).

### Dr. Abelardo Acosta, M.D., Treating Physician

On November 20, 2008, Plaintiff presented to the office of Abelardo Acosta, M.D., after Dr. Webb's referral for pain management. (Tr. 276-277).   Dr. Acosta noted that Plaintiff complained that his pain level was 9, on a scale from zero to 10, and the pain continues getting worse. (Tr. 276).   Dr. Acosta stated that Plaintiff suffered from lumbar radiculopathy, post laminectomy syndrome, and lumbago. (Tr. 277).   Dr. Acosta noted that he will proceed with pain management while Plaintiff is pondering whether to have a surgery as suggested by Dr. Baker and Dr. Cabrera. (Tr. 277).

Treatment notes from Dr. Acosta indicate that Plaintiff saw him regularly from the date of the initial consultation through the date of the hearing before the ALJ. (Tr. 275-277, 396-398, 400-403).   Plaintiff saw Dr. Acosta at least once a month during this 10 month period, for a total of 11 times. (Tr. 275-277, 396-398, 400-403).   Plaintiff repeatedly complained that his pain was

between 8 and 10, on a scale from zero to 10. (Tr. 276, 396-403, 405).   Plaintiff's pain increased with ambulation, activity, and movement. (Tr. 396-403, 405).   Furthermore, Dr. Acosta's treating notes beginning on January 15, 2009, indicate that Plaintiff was using a cane. (Tr. 396, 398, 400-402, 405).

On September 16, 2009, Dr. Acosta performed a lumbar injection procedure on Plaintiff and confirmed with a prescription that it is medically necessary for Plaintiff to use a cane due to his lumbar radiculopathy, unsteady gait and balance, lumbago, and post laminectomy syndrome. (Tr. 407-408).   Despite the pain management with Dr. Acosta, on March 30, 2009, Plaintiff was admitted to Peace River Regional Medical Center emergency room with complaints of back pain. (Tr. 351-356).   The emergency room records indicated that Plaintiff is still awaiting his spine surgery, but must first lose weight. (Tr. 352).   An X-ray scan was performed on the Plaintiff which revealed degenerative changes at L5-S1. (Tr. 357).

On April 1, 2009, Plaintiff returned to Dr. Baker's office for a consultation. (Tr. 394).   Dr. Baker stated that Plaintiff would probably require a revision surgery on his back. (Tr. 394). He noted that Dr. Cabrera would not perform a surgery on Plaintiff until his blood pressure is under control. (Tr. 34).   In addition, Dr. Baker performed a steroid injection on Plaintiff, noting that Plaintiff also currently sees Dr. Acosta for pain management. (Tr. 394).

*Administrative Law Judge's Decision*

The Administrative Law Judge Ruben Rivera, Jr., issued his "Notice of Decision – Unfavorable" on October 7, 2009. (Tr. 39-50). The Judge's specific findings were as follows:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.     The claimant has not engaged in substantial gainful activity since February 16, 2008, the alleged onset date (20 C.F.R. 404.1571 *et seq*.).

3.     The claimant has the following severe impairments: degenerative disc disease, status post lumbar laminectomy, obesity, hypertension, anxiety, and depression (20 C.F.R. 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the ALJ finds that the claimant has the residual functional capacity to perform a slightly reduced range of light work as defined in 20 C.F.R. 404.1567(b). The claimant should avoid concentrated exposure to extreme temperatures, humidity, vibration, hazards; and, fumes, odors, dusts, gases and poor ventilation. He retains the ability to perform simple routine tasks.

6.     The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7.     The claimant was born on November 6, 1964, and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563).

8.     The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564).

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. 404.1568).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can performed (20 C.F.R. 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 16, 2008, through the date of this decision. (20 C.F.R. 416.1520(g)). (Tr. 44-49).

Plaintiff appealed the decision of the Administrative Law Judge to the Appeals Council, but the Appeals Council declined review by order dated April 22, 2011. (Tr. 2-5). This left the ALJ's decision as the final decision of the Commissioner.   Plaintiff then filed his Complaint in this Court pursuant to 42 U.S.C. § 1383(c).

## STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, and whether the findings are supported by substantial evidence. Hibbard v. Comm'r, 2007 WL 4365647 at *2 (M.D. Fla. Dec. 12, 2007) (citing Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988)). In evaluating whether a Plaintiff is disabled, the ALJ must follow the sequential inquiry described in the regulation.[3]  (20 C.F.R. §§ 404.1520(a), 404.920(a)). The Commissioner's findings of fact are conclusive if supported by substantial evidence (42 U.S.C. § 405(g)).

---

[3] The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability. The steps are as follows:
    *Step 1*. Is the claimant engaged in substantial gainful activity? If the claimant is engaged in such activity, then he or she is not disabled. If not, then the ALJ must move on to the next question.
    *Step 2*. Does the claimant suffer from a severe impairment? If not, then the claimant is not disabled. If there is a severe impairment, the ALJ moves on to step three.
    *Step 3*. Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.   If so, then the claimant is disabled. If not, the next question must be resolved.
    *Step 4*. Can the claimant perform his or her former work? If the claimant can perform his or her past relevant work, he or she is not disabled. If not, the ALJ must answer the last question.
    *Step 5*. Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.   If the claimant cannot engage in other work, then he or she is disabled.   See 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

"Substantial evidence is more than a scintilla – *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Hibbard, 2007 WL 4365647 at *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838B39 (11th Cir. 1982))); Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004). The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The Court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." Phillips, 357 F.3d at 1240 n.8; Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005). If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).

Congress has empowered the District Court to reverse the decision of the Commissioner without remanding the case. 42 U.S.C. § 405(g) (sentence four). The District Court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the District Court with sufficient reasoning to determine that the Commissioner properly applied the law. Williams v. Comm'r, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005) (citing Keeton v. Dep't of Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994));

Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).

## **DISCUSSION**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. (42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505). The impairment must be severe, making the Plaintiff unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. (42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511). To determine whether the Plaintiff is disabled, the ALJ is required to evaluate the claim according to the established five-step evaluation process.

The Plaintiff sets forth seven arguments contesting the ALJ's decision as follows: (1) The ALJ failed to include Dr. Visser's opinion that the Plaintiff has extreme mental limitations; (2) Dr. Visser's opinion is entitled to greater weight than Dr Alidon; (3) the ALJ improperly considered the opinion of Dr. Alidon; (4) the ALJ failed to consider the opinion of Dr. Acosta who opined that the claimant needs a cane to ambulate; (5) the ALJ's failure to consider the fact that the Plaintiff needs a cane led to an improper RFC assessment; (6) the ALJ's determination that the Plaintiff's obesity is severe should have limited the Plaintiff's basic work activities; and (7) the ALJ improperly questioned the Plaintiff's credibility.   The Commissioner argues that the ALJ's decision was supported by substantial evidence and in accordance with the law.

### *(1)Whether the ALJ Failed to Include Dr. Visser's Opinion that the Plaintiff has Extreme Mental Limitations*

The Plaintiff argues the ALJ ignored Dr. Visser's opinion that the Plaintiff had marked or extreme mental limitations even through the ALJ gave great weight to Dr. Visser's opinion. As

such, Plaintiff states that the ALJ's decision was not supported by substantial evidence, he should have called a vocational expert to testify rather than merely rely on the grids and the ALJ failed to find the Plaintiff's impairment was so severe that it met the criteria under 12.04 (based on the Plaintiffs depression) and under 12.06 (based on the Plaintiff's anxiety).   The Commissioner argues that the Plaintiff misread the report filed by Dr. Visser which has headings labeled in bold, including "Restriction of Activities of Daily Living (Marked or Extreme)," "Difficulties in Maintaining Social Functioning (Marked or Extreme)," "Difficulties in Maintaining Concentration, Persistence or Pace (Marked or Extreme)," "Episodes of De-compensation, Lasting More Than Two Weeks (In last year)," and "Handle Own Finances" (Tr. 265). Under each heading, Dr. Visser appears to describe Plaintiff's condition as it relates to the functional area indicated by the heading (Tr. 265).

<u>(a)*Whether the ALJ's Decision Ignored Dr. Visser's Findings*</u>

Under "Restriction of Activities of Daily Living (Marked or Extreme)" Dr. Vissar opined "[h]is depression causes him to view himself in a negative light.   If he were employed, he would feel better about himself." (Tr. 265).   Under "Difficulties in Maintaining Social Functioning (Marked or Extreme)" Dr. Visser opined "[a]t the moment, he finds it difficult to function socially. His depression interferes with his ability to relate well to others." (Tr. 265). Under "Difficulties in Maintaining Concentration, Persistence or Pace (Marked or Extreme), Dr. Visser opined that the Plaintiff had "[s]evere problems with concentration were observed, when he attempted to do Serial Sevens Subtractions."   Dr. Visser also opined regarding "Episodes of De-Compensation, Lasting more than Two Weeks (In last year)" that the "Claimant has been chronically 'down' the last few months."

None of Dr. Visser's statements under the heading Marked or Exteme indicated that the Plaintiff's depression was marked or extreme.   This is supported--as the ALJ noted--by the fact that while the Plaintiff complains of depression and anxiety, he has never received any mental health treatments. (Tr. 47).   The ALJ also found that "[w]ith regard to persistence or pace, the claimant has moderate difficulties. The claimant needs reminders to take medications; however, he reported being able to understand and carry out spoken instructions very well." (Tr. 45).   The ALJ further found that the Plaintiff had experienced no episodes of decompensation which had been of extended duration. (Tr. 45).   In his decision the ALJ stated:

> Dr. Visser described [Plaintiff] as a demoralized person, mainly due to having lost his job as perceived this as an essential part of his identity.   Although he maintains he has anxiety and is depressed; the claimant has not received any mental health treatment.   Dr. Visser opines the claimant is depressed because of his unemployment; and if he were employed, he would feel better about himself.   He indicated the claimant has poor reading skills and severe problems with concentration; nevertheless, he presented his information on a logical manger, [sic] did not lose his train of thought or go off on tangents.

(Tr. 47).   The ALJ continued by noting the opinion of Dr. Gildegardo Alidon, a State Agency psychological consultant, who reviewed the Plaintiff's case file.   The ALJ stated:

> Dr. Gildegardo Alidon, a Psychiatrist, reviewed the medical evidence of the record and provided a psychiatric review technique as well as a mental residual functional capacity.   While Dr. Alidon advised the claimant would have some difficulty with complex and detailed tasks.   Nonetheless, he indicated the claimant has no significant limitation in his social interactions; and, has no adaptive difficulties other than those required in complex detailed work.   Therefore, Dr. Alidon opines the claimant can adequately pace, function, and attend to any simple routine tasks.

(Tr. 47).   The Commissioner also notes that Dr. Alidon reviewed the findings of Dr. Visser in making his determination and that further supports the Commissioner's decision that Dr. Visser did not find the Plaintiff had marked or extreme mental conditions. (Tr. 294, 296).

The fact Dr. Alidon considered Dr. Visser's opinion and determined that the Plaintiff had

no marked or extreme mental impairments is a strong indication to the Court that Dr. Visser did not

find the Plaintiff had marked or extreme mental issues as argued by the Plaintiff.   Thus, it is clear

that the ALJ did not err when he gave great weight to Dr. Visser's opinion but did not find that the

Plaintiff had marked or extreme mental impairments.

### (b) Whether the ALJ Erred by not Calling a Vocational Expert

Here the ALJ found the Plaintiff had the Residual Functional Capacity (RFC) to perform a

slightly reduced range of light work.   Once the ALJ finds that a claimant cannot return to her prior

work, the burden of proof shifts to the Commissioner to establish that the claimant could perform

other work that exists in the national economy.   Augusto v. Commissioner of Social Security,

2008 WL 186541 *7 (M.D. Fla. January 18, 2008) (citing Foote, 67 F.3d at 1558).   In determining

whether the Commissioner has met this burden, the ALJ must develop a full record regarding the

vocational opportunities available to a claimant.   Allen v. Sullivan, 880 F.2d 1200, 1201 (11th

Cir.1989). This burden may sometimes be met through exclusive reliance on the grids.   Augusto,

2008 WL 186541 at *7.   Exclusive reliance on the grids is appropriate where the claimant suffers

primarily from an exertional impairment, without significant non-exertional factors.   20 C.F.R.

Part 404, Subpart P, Appendix 2, § 200.00(e); Augusto, 2008 WL 186541 at *7 (citing Heckler v.

Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L. Ed.2d 66 (1983) (holding exclusive reliance on the

grids is appropriate in cases involving only exertional impairments, impairments which place

limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate either when a claimant is unable to perform a full

range of work at a given residual functional level or when a claimant has a non-exertional

impairment that significantly limits basic work skills.   <u>Augusto</u>, 2008 WL 186541 at *7 (citing <u>Walter v. Bowen</u>, 826 F.2d 996, 1002-3 (11th Cir.1987)).   In almost all of such cases, the Commissioner's burden can be met only through the use of a VE.   <u>Augusto</u>, 2008 WL 186541 at *7 (citing <u>Foote</u>, 67 F.3d at 1559).   It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a VE to establish whether the claimant can perform work which exists in the national economy.   <u>Augusto</u>, 2008 WL 186541 at *7.   In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.   <u>Id.</u> (citing <u>Foote</u>, 67 F.3d at 1559).

   To preclude use of the grids, a limitation must significantly or severely restrict the ability to work.   A minor or merely possible restriction is insufficient.   <u>Augusto</u>, 2008 WL 186541 at *7 (citing <u>Kimbrough v. Sec'y of Health & Human Servs</u>., 801 F.2d 794, 796 (6th Cir.1986)).

   The Plaintiff states the ALJ should have called a Vocational Expert (VE) to testify rather than relying on Grids to determine the Plaintiff could find jobs in the national economy at the Fifth Step.   As grounds, the Plaintiff argues that the ALJ ignored Dr. Visser's opinion that the Plaintiff had marked or extreme mental impairments even though the ALJ gave great weight to Dr. Visser's opinion. The Plaintiff's argument lacks merit.   As noted above, the ALJ did not discard part of Dr. Visser's testimony stating that the Plaintiff had marked or extreme mental impairments.   Instead, the ALJ noted Dr. Visser's opinion and made a well substantiated conclusion regarding the nature of Plaintiff's mental impairments and mental residual functional capacity.   As noted above, the opinions of Dr. Visser were merely placed under headings that contained the words marked or extreme in parenthesis beside the heading.   Dr. Visser's and Dr. Alidon's opinions did not reflect

-17-

that the Plaintiff had marked or extreme mental impairments.   Moreover, contrary to Plaintiff's assertion, the ALJ did not have to incorporate all of the mental limitations noted by Dr. Visser or Dr. Alidon because, although the ALJ gave the opinions great weight, he notably did not adopt their opinions, that is, the ALJ did not determine to accept every aspect of their opinions (Tr. 23). Under the Regulations, Physicians' statements about a claimant's limitations are important evidence that must be considered in assessing a claimant's residual functional capacity, but such statements are not determinative. 20 C.F.R. §§ 404.1513(b), 404.1527, 404.1545. Although an ALJ will consider opinions from medical sources on issues such as the claimant's residual functional capacity, "the final responsibility for deciding [the residual functional capacity] is reserved for the Commissioner." 20 C.F.R. § 404.1527(e)(2).

Thus, even if the ALJ had ignored part of Dr. Visser's opinion it would not have changed nor invalidated his mental RFC determination. See 20 C.F.R. § 404.1527(e)(2)(stating that the Commissioner has the final responsibility for deciding the RFC).   Consequently, the ALJ did not err by relying on the grids and not calling a VE to testify at Step Five of his decision because the Plaintiff did not have a limitation that significantly or severely restrict his ability to work. Augusto, 2008 WL 186541 at *7.

### (c) Whether the Plaintiff's Impairments Satisfy the Listings in 12.04 and 12.06

The Plaintiff argues that he satisfies the function criteria under 12.04 and 12.06 found in 20 C.F.R. Pt. 404, Subpt. P, App 1, based on his severe depressive disorder and anxiety.   The Plaintiff again bases this assumption on the marked or extreme parentheticals in the headings found in Dr. Visser's report.   The Court has already discounted the Plaintiff's Argument noting that nothing in

Dr. Visser's opinion supports a finding of marked or extreme mental impairments.  The ALJ further noted that the Plaintiff had never sought out any mental health care for his alleged issues.

To meet the criteria of 12.04 the Plaintiff must meet the requirements listed in 12.04(A) and(B).   12.04(A) states that an individual must have a

> [m]edically documented persistence, either continuous or intermittent, of one of the following:
> 1.   Depressive syndrome characterized by at least four of the following
>       (a) Anhedonia or pervasive loss of interest in almost all activities
>       (b) Appetite disturbance with change in weight; or
>       (c) Sleep disturbance;
>       (d) Psychomotor agitation or retardation or
>       (e) Decreased energy; or
>       (f) Feelings of guilt or worthlessness; or
>       (g) Difficulty concentrating or thinking; or
>       (h) Thoughts of suicide; or
>       (i)  Hallucinations, delusions, or paranoid thinking; or
> 2.   Manic Syndrome characterized by at least three of the following:
>       (a)Hyperactivity; or
>       (a) Pressure of speech; or
>       (b) Flight of ideas; or
>       (c) Inflated self-esteem; or
>       (d) Decreased need for sleep; or
>       (e) Easy distractibility; or
>       (f) Involvement in activities that have a probability of painful consequences which are not recognized; or
>       (g)  Hallucinations, delusions, or paranoid thinking. . .

20 C.F.R. Pt. 404, Subpt. P, App 1, 12.04(A) and (B).

Anxiety related disorders are covered under Regulation 12.06. Regulation 12.06 states in pertinent part that "the required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements of A and C are satisfied."   Subsection A states:

> A.  Medically documented findings of at least one of the following:
>       (1) Generalized persistent accompanied by three out of four of the following signs or symptoms:
>             a.  Motor tension; or

                    b.   Automatic hyperactivity; or

                    c.   Apprehensive expectations; or

                    d.   Vigilance and scanning or

(2) A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

(3) Recurrent severe panic attacks manifested by a sudden unpredictable panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

(4) Recurrent obsessions or compulsions which are a source of marked distress; or

(5) Recurrent and intrusive recollections of traumatic experience, which are a source of marked distress; and

B. Resulting in at least two of the following:

(1) Marked restriction of activities of daily living; or

(2) Marked difficulties in maintaining social functioning; or

(3) Marked difficulties in maintaining concentration persistence and pace; or

(4) Repeated episodes of decompensation, each of extended duration

C. Resulting in complete inability to function independently outside the area if one's home.

20 C.F.R. Pt. 404, Subpt. P, App 1, 12.06(A),(B) and (C).

The Plaintiff in this instance has no prior history of medical mental health treatment and the only evidence the Plaintiff offers that the ALJ erred in not finding him disable under 12.04 and. 12.06 is the mistaken position that Dr. Visser found the Plaintiff had marked or extreme mental impairments.

The ALJ noted in his decision that the Plaintiff failed to meet the 12.04 criteria because the Plaintiff only has mild restrictions in his daily living activities: he drives, cooks, shops and is capable of attending to his own personal care. (Tr. 45).   The ALJ found that any limitations in the Plaintiffs ability to perform his daily living tasks were caused by physical and not mental impairments. (Tr. 45).   The ALJ continued:

[i]n social functioning, the claimant has mild difficulties.   The Plaintiff plays cards

and dice with friends.   The claimant reported having a short temper due to his pain; however, he spends time with his family and there is no indication the claimant has isolated himself.   He reported being able to go outside on his own; and, is able to go shopping.   Again any difficulty in this area arises out of his physical impairments.

With regard to concentration, persistence or pace, the claimant has moderate difficulties.   The claimant needs reminders to take medications; however, he reported being able to understand and carry out spoken instruction very well.
As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.   There is no evidence the claimant has suffered three episodes within one year, each lasting for at least two weeks.   Therefore, the claimant has not experienced any episodes of decompensation as defined by the regulations.

(Tr. 45).

Regarding 12.06, the ALJ found that the claimant had reported being able to do things for himself and is able to function outside of the home, drives by himself and goes shopping. (Tr. 45). Thus, the ALJ properly reviewed the standards found under Regulations 12.04 and 12.06 and supported his decision with medical evidence from the record that the Plaintiff was not mentally disabled under the regulations.

### (2) Whether Dr. Visser's Opinion was Entitled to Greater Weight Than Dr Alidon

The Plaintiff argues that the ALJ erred because he did not give greater weight to Dr. Visser over the opinion of Dr. Alidon.   The Plaintiff argues that Dr. Alidon's opinion differed drastically from that of Dr. Visser as Dr. Alidon opined that claimant had only mild limitations in activities of daily living and social functioning, and only moderate limitations in terms of concentration, persistence, and pace (Tr. 294). The ALJ then accepted Dr. Alidon's opinion that claimant is limited to "simple, repetitive tasks" by giving Dr. Alidon great weight and limiting claimant to "simple, routine tasks" in the RFC (Tr. 46, 48, 282).

The Plaintiff argues that Dr. Visser was an examining physician and that Dr. Alidon was only a consulting physician basing his opinion upon the medical record; thus, the Plaintiff states the opinion of Dr. Visser should carry the greater weight. See 20 C.F.R. § 404.1527 ("Generally, we give more weight to the opinion source who has examined you that to the opinion of a source who has not examined you.").   The Plaintiff bases his argument on the fact that Dr. Viser's form listed headings that included the terms Marked and Extreme.   Therefore, the Plaintiff argues that Dr. Visser's opinion should be given the greater weight because Dr. Alidon did not find marked or extreme mental limitations.   However, as discussed above, those headings do not agree with the opinions of Dr. Visser, and are therefore discarded.

The ALJ reviewed the opinion of Dr. Visser who found the Plaintiff "is depressed because of his unemployment; and if he were employed, he would feel better about himself.   He indicated the claimant has poor reading skills and severe problems with concentration; nevertheless, he presented his information on a logical manger, [sic] did not lose his train of thought or go off on tangents." (Tr. 47).   The ALJ also noted the opinion of Dr. Alidon that "indicated the claimant has no significant limitation in his social interactions; and, has no adaptive difficulties other than those required in complex detailed work.   Therefore, Dr. Alidon opines the claimant can adequately pace, function, and attend to any simple routine tasks." (Tr. 47).   Dr. Alison also had the opinion and report of Dr. Visser when he reviewed the Plaintiff's medical records and determined that the Plaintiff's mental functions were mild or moderate. (Tr. 294, 296).

The ALJ as trier of fact has the authority to resolve any conflicts within the opinions of the medical providers and consultants and arrive at an RFC finding. 20 C.F.R. §§ 404.1527(c )(2),(4) As such, the ALJ did not err by considering and giving great weight to both Dr. Visser and Alidon

in his decision.   Particularly, because neither Dr. Visser nor Dr. Alidon found that the Plaintiff had severe, marked or extreme mental limitations, their opinions do not contradict each other but provide substantial support for the ALJ's decision.

### (3) Whether the ALJ Improperly Considered the Opinion of Dr. Alidon

The Plaintiff argues that it was improper for the ALJ to rely on the opinion of Dr. Alidon because Dr. Alidon opined that the Plaintiff was moderately limited on his ability to understand and remember detailed instructions; moderately limited in ability to maintain attention and concentration for extended periods; moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderately limited in his ability to set realistic goals or make plans independently of others.   (Tr. 280-281).   Thus, the Plaintiff argues that Dr. Alidon's opinion establishes that he was unable to consistently perform the tasks necessary to complete a five (5) day work week.

In this instance, the Plaintiff relies on Bankston v. Commissioner, 127 F. Supp. 820, 826 (E.D. Mich. 2000), for the proposition that the word "often" and the word moderate have the same meaning under the regulations.   In Bankston, at the administrative hearing, the Plaintiff's counsel asked the VE the impact on the Plaintiff's ability to perform sedentary jobs if he "often" had deficiencies of concentration, persistence and pace resulting in failure to complete tasks in a timely manner. 127 F. Supp. at 825.   Plaintiff's counsel formed his question by referring to the PRTF, using the word "often" to describe Plaintiff's deficiencies. Id. 825-26. "The scale on the PRTF measuring the consistency of Plaintiff's deficiencies of concentration, persistence, or pace is as follows: NEVER, SELDOM, OFTEN, FREQUENT, and CONSTANT." Id. at 826 (emphasis in

original).     Asked by the ALJ how to interpret the word "often," Plaintiff's counsel responded that in this case the word "often" would be interpreted as an inability to concentrate one-third of the time. Id. The VE responded that a person could perform no work if he could not concentrate one-third of the time. Id.

The Plaintiff argues that the word "often" was replaced in the Regulations by the word "moderate." See 20 C.F.R. § 404.1520a(4)(stating "[w]hen we rate the degree of limitation in the first three functional areas of (activities of daily living; social functioning; and concentration persistence and pace) we will use the following five point scale: None, mild, moderate, marked and extreme,").   Thus, relying on the Bankston definition, the Plaintiff argues that the Plaintiff could only work one third of the day and/or work week and therefore, he should be found disabled.

Dr. Alidon did state that the Plaintiff had moderate limitations in some areas. The ALJ concluded that "[w]hile Dr. Alidon advised the claimant would have some difficulty with complex and detailed tasks. (Tr. 280-282).   Nonetheless, he indicated the claimant has no significant limitations in his social interactions; and has no adaptive difficulties other than those required in complex detailed work." (Tr. 47). The ALJ continued "[t]herefore Dr. Alidon opines the claimant can adequately pace, function, and attend, to any simple routine tasks." (Tr. 47).

Dr. Alidon ultimately opined that Plaintiff could adequately function and attend to simple repetitive tasks and had no significant limitations in social functioning, which is consistent with the ALJ's residual functional capacity finding (Tr. 47, 282). Dr. Alidon concluded the Plaintiff could perform simple tasks, which supports the ALJ's RFC.   Further, in opining on whether the Plaintiff's "moderate limitations" would prevent from working a full work day, Dr. Alidon stated the Plaintiff could "adequately pace on simple, repetitive tasks throughout the normal work day."

(Tr. 282).  Thus, Dr. Alidon's conclusion is in agreement with the ALJ's RFC and refutes the Plaintiff's definition of "moderate limitation" in regards to the Plaintiff's ability to work an average work day.

As the trier of fact, the ALJ takes the opinion evidence along with the rest of the medical evidence and formulates a residual functional capacity finding based on the record as whole. 20 C.F.R. §§ 404.1520, 404.1527(c), 404.1545(a)(3), 404.1546(c).  The ALJ's RFC determination found the Plaintiff could perform a full range of light work and the definitions provided by Dr. Alidon are in agreement with the ALJ's determination. Thus, the ALJ did not err in his consideration of Dr. Alidon's opinion.

### (4) Whether the ALJ Failed to Consider the Opinion of Dr. Acosta that the Plaintiff Needed a Cane to Ambulate in his RFC Determination

The Plaintiff argues the ALJ erred by not considering the opinion of a treating physician Dr. Acosta that the Plaintiff medically needed a cane to ambulate when he made his RFC determination.   The Commissioner responds that Dr. Acosta did not give a medical opinion that the Plaintiff needed a cane to ambulate but prescribed a cane for the Plaintiff's use.   The Commissioner argues that a prescription for a cane is not the same as a medical opinion that the Plaintiff medically needs a cane to ambulate.   The Commissioner further states that if the Court considers the prescription for a cane is equal to a medical opinion then the ALJ's failure to discuss Dr. Acosta's prescription for a cane is at most harmless error because the medical evidence supports the ALJ's conclusions.

Opinions from treating physicians are entitled to substantial or considerable weight unless there is good cause for not affording them such weight. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir.2004). Good cause exists when the treating physician's opinion is not bolstered by the

evidence, the evidence supports a contrary finding, or when the opinion is conclusory or inconsistent with the physician's own medical records. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir.1997).

Courts have found that a notation on a prescription pad that a claimant is disabled is conslusory and provides grounds for discounting the opinion. <u>May v. Astrue</u>, 2009 WL 3878170 * 4 (M.D.Fla. November 19, 2009).   In this instance, the Plaintiff presents no evidence that Dr. Acosta opined that he was disabled, only that Dr. Acosta prescribed a cane for his use.   The Plaintiff alleged he became disabled in February 2008;   however, Dr. Acosta did not prescribe a cane for Plaintiff until September 2009. (Tr. 42, 407).

In fact, all of the Plaintiff's arguments in the Plaintiff's brief referring to Dr. Acosta are not related to an opinion given by Dr. Acosta but instead are merely claims the Plaintiff himself made to Dr. Acosta.   For example, the Plaintiff claims that during his visits with Dr. Acosta he complained that he had pain between 8 and 10 on a scale of 1-10, but never states that Dr. Acosta found him to be disabled because of the pain, nor does he allege that Dr. Acosta treated him for the pain. (Doc. # 22, p. 16).   The Plaintiff complained of back and leg pain and that the pain increased with ambulatory activity. (Doc. # 22, p. 16).   However, the Plaintiff fails to state any opinion from Dr. Acosta that would support his claim other than the fact that Dr. Acosta prescribed the use of a cane.   The Plaintiff's own complaints are not sufficient medical evidence to support his claim. As noted above, a prescription for a cane is not an opinion that the Plaintiff is disabled.   The Plaintiff's claim that the ALJ failed to discount the opinion of Dr. Acosta is based upon conclusory evidence and the Plaintiff's own complaints.   Therefore, it is recommended the ALJ did not err by

not discounting Dr. Acosta because Dr. Acosta did not give an opinion that the Plaintiff was disabled.

*(5)Whether the Cane Should have been Considered in the RFC Assessment*

In this instance, the Plaintiff argues that the use of a cane should have led to a finding that he was not able to perform at any level or at least should be remanded for consideration of the Plaintiff's need for a cane in making the Plaintiff's RFC determination.   The fourth step in the evaluation process requires the ALJ to determine the plaintiff's residual functional capacity (RFC) and, based on that determination, decide whether the plaintiff is able to return to his/her previous work.   McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).   The determination of RFC is within the authority of the ALJ and along with the claimant's age, education, and work experience, the RFC is considered in determining whether the claimant can work. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)).   The RFC assessment is based upon all the relevant evidence of a claimant's remaining ability to do work despite her impairments. Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); Lewis, 125 F.3d at 1440 (11th Cir. 1997) (citing 20 C.F.R. ' 404.1545(a)).   The ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case.   Phillips, 357 F.3d at 1238.   That is, the ALJ must determine if the claimant is limited to a particular work level.   Id. (citing 20 C.F.R. § 404.1567).

The ALJ acknowledged that the Plaintiff testified that he needed a cane. (Tr. 46). The ALJ wrote the Plaintiff explained he uses a cane because he has "numbness in his legs; and at times, he feels his legs are going to give in" (Tr. 46).   However, the ALJ concluded that the Plaintiff had the

RFC to work a full range or slightly reduced range of light work.   In making his RFC

determination, the ALJ wrote in pertinent part:

> [a] review of the record shows the claimant has a long history of chronic back
> problems.   Mr. Estelle had a lumbar laminectomy in 1992; and, a Magnetic
> Resonance Imagining (MRI) has evidence he now has a herniated disk at L5-S1
> (Exhibits 6F & 10F).   His doctors have advised him he needs a revision surgery
> (Exhibit 5).   The claim has been under the care of a pain management specialist for
> the last eight months.   At first, he reported the medication was not working, and
> he was experiencing constant pain.   However, in the past four months, he has
> consistently reported that the medications are very effective; and, he wished to
> continue the prescribed treatment. . . .

(Tr. 47).   After brief review of the Plaintiff's coronary, obesity, and psychological issues, the ALJ

concluded that:

> [a]fter careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be expected to
> cause the alleged symptoms; however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms are not credible to the
> extent they are inconsistent with the above residual functional capacity.   While the
> undersigned acknowledges the claimant has impairments; the totality of the record
> suggests they do not preclude all types if substantial gainful activity. Of note, the
> record does not contain any opinions from treating or examining physicians
> indicating that the claimant is disabled, or even has limitations greater that those
> determined in this decision.   Further the claimant testified he applied and collected
> the maximum allowable amount of unemployment, including all available
> extensions of benefits. . . .   There is no indication in his medical records of his back
> condition worsening since the alleged onset date; in fact, the last treatment notes
> show the claimant's prescribed medications are working.   The claimant testified
> that he stopped working because he was laid off from his job; he explained the
> company was cutting back due to the economy. . . .

(Tr. 47-48).   Thus, it is apparent that the ALJ considered all of the Plaintiff's medical records and

doctors reports—none of which—found the Plaintiff to be disabled.

The burden of proving disability is on the Plaintiff, and here there is no evidence that the

cane was required for the Plaintiff to ambulate.   "To find that a hand-held assistive device is

medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed . . . ." Hagan v. Astrue, 2010 WL 1049548 * 4 (M.D. Fla. March 22, 2010) (citing Social Security Ruling ("SSR") 96–9p, 1996 WL 374185 *7 (S.S.A. July 2, 1996)).   Here, the evidence in the record that the ALJ relied upon demonstrates that the Plaintiff can ambulate without a cane.

The medical record is replete with examples of the Plaintiff's ability to ambulate without the use of the prescribed cane. Plaintiff alleged he became disabled in February 2008;   however, Dr. Acosta did not prescribe a cane for Plaintiff until September 2009. (Tr. 42, 407). The Plaintiff's treatment notes indicate that Plaintiff was able to ambulate independently or unassisted and had a normal or steady gait before the cane was prescribed in September 2009. (Tr. 216, 222, 246, 275). Notably, in November 2008, Dr. Acosta stated that Plaintiff's gait was "within normal limits," which contradicts his assertion in his prescription that Plaintiff had an unsteady gait (Tr. 277). The first treatment note that indicated that Plaintiff was using a cane is not until January 2009 (Tr. 402).

Further, since January 2009, the treatment notes also show that Plaintiff did not always need a cane to ambulate (Tr. 397, 399). For instance, in April and June 2009, treatment notes from SW Florida Pain Center indicate that Plaintiff walked without assistance and was not using a cane (Tr. 397, 399).   When visiting SW Florida Pain Center in March 2009, the examiner noted Plaintiff was using a cane (Tr. 400). Yet on two separate occasions, also in March 2009, when Plaintiff sought treatment from Peace River Medical, examiners noted he was not using a cane to ambulate.   (Tr. 354, 368). Specifically, examiners noted that Plaintiff was "up and ambulating about the room" with a steady gait, that he "ambulated without assistance," and that he ambulated

independently.   (Tr. 354-55, 368). Thus, the treatment notes show that Plaintiff did not need a cane to ambulate and that his gait was steady when he walked without the use of a cane.

Simply because he was prescribed a cane does not mean that the cane would make him unable to work at a light level of exertion as determined by the ALJ. See Hysmith v Astrue, 2009 WL 3161789 * 6 (N.D. Fla. September 23, 2009) (holding that the clamant being prescribed a cane was not grounds for reversal nor did it establish disability where the physicians in the case noted the claimant could walk without the cane albeit with a limp).   While the ALJ noted that the Plaintiff testified that he needed a cane, the ALJ used the medical record as a whole to determine the Plaintiff's RFC.   Thus, whether or not the ALJ discussed the Plaintiff's prescription for a cane is harmless because the medical evidence in the record, as noted above, supports the ALJ's RFC decision and that the Plaintiff does not need a cane to ambulate. See Reeves v. Astrue, 238 F. App'x. 507, 513 (11th Cir. 2007) (holding that the ALJ's failure to address one of the Plaintiff's alleged conditions was not erroneous because the objective medical evidence was inconsistent with the claim).

### (6) Whether the ALJ Should have Limited the Plaintiff's Basic Work Activities Because of the Plaintiff's Obesity

The Plaintiff states the ALJ only considered his obesity in combination with his coronary disease and failed to consider his obesity in combination with all of the Plaintiff's impairments when he made his RFC determination. As such, the Plaintiff states the ALJ failed to support his RFC determination with substantial evidence.   The Commissioner responds the ALJ properly evaluated the Plaintiff's obesity in compliance with SSR 02-1p because he considered Plaintiff's obesity on his ability to work.

Social Security Ruling 02–01p provides that while obesity is no longer a listed impairment, its effects and combined effects with other impairments should be considered when evaluating a disability. <u>Norris v. Astrue</u>, 2012 WL 360158 *9 (M.D. Fla. February 2, 2012).   Specifically, obesity can cause limitations in the exertional functions of sitting, standing, walking, lifting, carrying, pushing, and pulling; also, obesity can affect the postural functions of climbing, balancing, stooping, and crouching. <u>Id.</u> (citing SSR 02–01 p. 67).

In his decision, the ALJ wrote "[t]he undersigned also considered the effects of the claimant's obesity in reducing the claimant's residual functional capacity pursuant to Social Security Ruling 02-01p."   (Tr. 47).   The ALJ continued that "[claimant's] doctors advised him not to focus on the coronary disease as a problem; but, should control his weight and cease smoking.   In fact, his doctors opine that would help him more than any medication they could prescribe . . . ." (Tr. 47).

It is clear from the ALJ's decision that he specifically considered the impact of Plaintiff's obesity in his RFC assessment in accord with the SSR 02-01p. <u>See</u> <u>Williams v. Astrue</u>, 2011 WL 6412224 * 9 (M. D. Ala. December 21, 2011) (holding the ALJ considered the Plaintiff's obesity when the ALJ specifically noted the claimants obesity in his RFC assessment and also referred to SSR 02-01p).   Thus, the Court recommends the ALJ considered the Plaintiff's obesity in making his RFC determination and supported his RFC decision with substantial evidence from the record.

### (7)Whether the ALJ Improperly Questioned the Plaintiff's Credibility

The Plaintiff argues that the ALJ improperly relied on the fact that the Plaintiff received unemployment benefits and that there was no evidence in the record to suggest that his condition worsened since the alleged onset date to find his disability claims were not credible.   The Plaintiff

argues that these grounds are not proper for rejecting the Plaintiff's claims. The Commissioner argues the ALJ articulated explicit and adequate reasons for discrediting the Plaintiff's complaints.

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Foote v. Chater, 67 F.3d 1553, 1561–62; Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. Hale v. Bowman, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting the Plaintiff's testimony requires that the testimony be accepted as true. Foote, 67 F.3d at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

In his decision, the ALJ stated:

> [a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

While the undersigned acknowledges the claimant has impairment; the totality of the record suggests they do not preclude all types of substantial gainful activity. Of note, the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled, or even has limitations greater than those determined in this decision.  Further, the claimant testified he applied and collected the maximum allowable amount of unemployment, including all available extensions of benefits.  The records in fact confirm, the claimant collected benefits from the first quarter of 2008 through and including the first quarter of 2009.  A claimant's application for unemployment compensation benefits adversely affects his credibility as it contradicts the very core of the allegations in him seeking disability benefits.  In order to obtain unemployment compensation the applicant must hold himself available, willing, and able to work. On the other hand, in applying for disability, the claimant maintains his impairments have rendered him completely unable to engage in any substantial gainful activity.  A claimant cannot, on the one hand, claim to be not disabled in order to collect unemployment benefits; and, on the other hand, claim to be disabled in order to collect Social Security disability benefits.  Hence, by its very nature, the application for unemployment compensation serves to negate the claimant's contentions of disability. See Jernigan v Sullivan, 948 F. 2d 1070 (8th Cir. 1991).  Additionally, as aforementioned, the claimant has an extensive history of back problems; and, the record shows he worked for many years, despite his impairment.  There is no indication in his medical records of his back condition worsening since the alleged onset date; in fact, the last treatment notes show the claimant's prescribed medications are working.   The claimant testified he stopped working because he was laid off from his job; he explained the company was cutting back due to the economy.   Unfortunately, the claimant's anxiety and depression appear to have been a direct result of him losing his job.  The fact remains, however, that the impairment did not prevent the claimant from working at the time, strongly suggests that it would not prevent work.

(Tr. 47-48).

While the Plaintiff argues that the ALJ erred by considering his receipt of unemployment benefits in his credibility determination, the ALJ did not state the Plaintiff was not disabled because he accepted unemployment benefits, but noted that the receipt of unemployment benefits is inconsistent to a claim for disability benefits. As noted by the ALJ in his credibility determination, when an individual seeks unemployment benefits he must represent to the state that he be ready, willing, and able to work and actively looking for employment.   When that same

individual applies for disability benefits, he must represent and prove to the Commissioner that he is unable to work.  The two positions are inconsistent. As the ALJ noted in his decision, "A claimant cannot, on the one hand, claim to be not disabled in order to collect unemployment benefits; and, on the other hand, claim to be disabled in order to collect Social Security disability benefits."  (Tr. 48).  "[B]y its very nature, the application for unemployment compensation serves to negate the claimant's contentions of disability." (Tr. 48). Thus, the ALJ used the inconsistent positions taken by the Plaintiff to support his conclusion that the Plaintiff's claims of disabling impairments were not as severe as the Plaintiff claimed because of the inconsistent positions needed to claim each of the respective benefits. See   Boyd v. Astrue, 2011 WL 125 9795 *6-7 (M.D. Fla. March 31, 2011) (noting that "it's an issue. . . partly of credibility. If a person is saying one thing to somebody and saying something else to somebody else it's a credibility issue.").    Therefore, the ALJ properly considered Plaintiff's receipt of unemployment compensation in making a credibility determination.

The ALJ further noted that the Plaintiff's back problems were present while he was still employed and they never prevented him from working. (Tr. 47-48).   The ALJ continued that there was no medical evidence provided by the Plaintiff that his back issues had medically deteriorated from the time he was still employed. (Tr. 48).   In fact, the Plaintiff himself stated that he did not stop working because of his back pain or other medical reasons, but because he was laid off from his job for economic reasons. (Tr. 48).   As such, the ALJ appropriately found the Plaintiff's claims to be less than credible because he lacked the medical evidence to prove that his pain was any worse than when he was employed.

The ALJ used the Plaintiff's inconsistent positions in applying for disability and

unemployment benefits, the fact that the Defendant's back problems had not deteriorated for the time he was employed to the claimed date of disability, and the fact that he did not stop working for medical reasons but because he was laid off from the job to find the Plaintiff's claims were not credible. It is within the ALJ's purview to consider "[o]ther factors concerning [a claimant's] functional limitations and restrictions due to pain or other symptoms." Boyd, 2011 WL 1259795 *6-7 (citing 20 C.F.R. § 404.1529(c)(3)(vii)).   Thus, this Court recommends that the ALJ properly made his credibility determination.

## CONCLUSION

Based upon the facts in the record, the Parties memoranda of law, and the ALJ's decision, the Court respectfully recommends the decision of the Commissioner was well supported by substantial evidence.   Therefore, it is recommended that the final decision of the Commissioner denying the Plaintiff's claim for disability be affirmed.

Accordingly, it is now **RECOMMENDED:**

The Decision of the Commissioner denying the Plaintiff Everett Estelle's application for disability benefits be **AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within **fourteen (14) days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this 31st day of July, 2012.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record